**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

Donna Payne

    v.                                 Case No. 15-cv-274-JD

Carolyn W. Colvin, Acting
Commissioner, Social
Security Administration

**REPORT AND RECOMMENDATION**

Pursuant to 42 U.S.C. § 405(g), Donna Payne moves to reverse the Acting Commissioner's decision to deny her applications for Social Security disability insurance benefits, or DIB, under Title II of the Social Security Act, 42 U.S.C. § 423, and for supplemental security income, or SSI, under Title XVI, 42 U.S.C. § 1382.  The Acting Commissioner moves for an order affirming her decision.  For the reasons that follow, this matter should be remanded to the Acting Commissioner.

## I.  **Standard of Review**

The applicable standard of review in this case provides, in pertinent part:

> The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without

> remanding the cause for a rehearing.  The findings of
> the Commissioner of Social Security as to any fact, if
> supported by substantial evidence, shall be conclusive
> . . . .

42 U.S.C. § 405(g) (setting out the standard of review for DIB

decisions); see also 42 U.S.C. § 1383(c)(3) (establishing §

405(g) as the standard of review for SSI decisions).  However,

the court "must uphold a denial of social security . . .

benefits unless 'the [Acting Commissioner] has committed a legal

or factual error in evaluating a particular claim.'"  Manso-

Pizarro v. Sec'y of HHS, 76 F.3d 15, 16 (1st Cir. 1996) (per

curiam) (quoting Sullivan v. Hudson, 490 U.S. 877, 885 (1989)).

     As for the statutory requirement that the Acting

Commissioner's findings of fact be supported by substantial

evidence, "[t]he substantial evidence test applies not only to

findings of basic evidentiary facts, but also to inferences and

conclusions drawn from such facts."  Alexandrou v. Sullivan, 764

F. Supp. 916, 917-18 (S.D.N.Y. 1991) (citing Levine v. Gardner,

360 F.2d 727, 730 (2d Cir. 1966)).  In turn, "[s]ubstantial

evidence is 'more than [a] mere scintilla.  It means such

relevant evidence as a reasonable mind might accept as adequate

to support a conclusion.'"  Currier v. Sec'y of HEW, 612 F.2d

594, 597 (1st Cir. 1980) (quoting Richardson v. Perales, 402

U.S. 389, 401 (1971)).  But, "[i]t is the responsibility of the

[Acting Commissioner] to determine issues of credibility and to draw inferences from the record evidence.  Indeed, the resolution of conflicts in the evidence is for the [Acting Commissioner], not the courts."  Irlanda Ortiz v. Sec'y of HHS, 955 F.2d 765, 769 (1st Cir. 1991) (per curiam) (citations omitted).  Moreover, the court "must uphold the [Acting Commissioner's] conclusion, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence."  Tsarelka v. Sec'y of HHS, 842 F.2d 529, 535 (1st Cir. 1988) (per curiam).  Finally, when determining whether a decision of the Acting Commissioner is supported by substantial evidence, the court must "review[ ] the evidence in the record as a whole."  Irlanda Ortiz, 955 F.2d at 769 (quoting Rodriguez v. Sec'y of HHS, 647 F.2d 218, 222 (1st Cir. 1981)).

## II.  **Background**

The parties have submitted a Joint Statement of Material Facts.  That statement, doc. no. 15, is part of the court's record and will be summarized here, rather than repeated in full.

Before she stopped working in August of 2008, Payne held jobs as a customer service clerk and as a secretary.  In her

3

applications for both DIB and SSI, she claimed to have become disabled on June 10, 2013.

## A.   Relevant Treatment History

Payne has been diagnosed with and treated for a variety of physical and mental impairments including, but not limited to degenerative disc disease, left hip trochanteric bursitis, right wrist pain, depression, and anxiety.  Payne's primary claims of error involve the consideration of her mental impairments.

In June of 2013, Payne saw her primary care provider, Dr. Deborah Ganem, for a physical examination.  She also followed up with Dr. Ganem on multiple issues, including acute anxiety and depression.  Over the next nine months, Payne saw Dr. Ganem about 10 more times for treatment of her depression and anxiety. During that time, Payne's condition were exacerbated by the deaths of her ex-husband and mother.  Dr. Ganem prescribed various medications for Payne's depression and anxiety,[1] and she recommended counseling, which Payne began in December of 2013, with Linda Stakun, of the Greater Nashua Mental Health Center ("GNMHC").  In March of 2014, Dr. Ganem advised Payne "to ask to see a prescriber at [GNMHC] since she [was] not getting better

---

[1]  Specifically, Dr. Ganem prescribed Ativan, Wellbutrin, Zoloft (sertraline), Klonopin (clonazepam), Valium (diazepam), Restoril (tempazepam), and alprazolam.

on [the] max meds that [Dr. Ganem felt] comfortable prescribing." Administrative Transcript (hereinafter "Tr.") 895.

In the fall of 2014, Dr. Ganem referred Payne to the Partial Hospital Program ("PHP") at Southern New Hampshire Medical Center. PHP, which is offered on an out-patient basis, "is an intensive short-term group therapy program . . . for individuals with psychiatric and co-occurring disorders." Tr. 913. Dr. Ganem referred Payne to PHP "for worsening of [her] depressive symptoms and anxiety." Tr. 946. Payne spent two days in PHP in October of 2014, and was discharged with instructions to "followup for psychiatric medications with Margaret Dorson, APRN, at Harbor Care Clinic." Tr. 945. In November of 2014, Payne saw Dorson who, in turn, referred her to Robert Dumond for counseling.

B. Opinion Evidence

In December of 2013, Payne saw Dr. M. Lorene Sipes, a psychologist, who performed a consultative examination and then produced a Mental Health Evaluation Report that documented the results of her examination. Dr. Sipes saw Payne for 20 minutes. She administered a mental status examination,[2] but she performed

---

[2] Specifically, Dr. Sipes evaluated Payne's: (1) behavior and

no psychological testing.  Dr. Sipes diagnosed Payne with major

depressive disorder and panic disorder with agoraphobia.  Based

upon her examination, Dr. Sipes opined that Payne was able to:

(1) "adequately perform activities of daily living," Tr. 659;

(2) "manage the social demands of most work situations," id.;

(3) "concentrate adequately and complete common tasks of most

work situations," Tr. 660; and (4) "effectively manage common

stressors of most work situations," id.  The form that Dr. Sipes

completed also asked her to "describe the claimant's ability to

. . . understand and remember very short and simple

instructions, and to understand and remember detailed

instructions, etc."  Id.  Dr. Sipes responded:

> Ms. Payne completed 12 years of formal education.
> Upon examination, she was able to understand the
> minimal requirements of the interview.  She was able
> to understand written and spoken language including
> metaphors.  She was able to follow written and spoken
> instructions.  Her short-term memory was fair to good
> and her long-term memory was good.  Thus, it is my
> clinical opinion that she is able to understand and
> remember simple oral and written instructions.

Id.  Despite being asked about Payne's ability to understand and

remember detailed instructions, Dr. Sipes did not opine that

Payne had that ability.

---

ability to cooperate; (2) characteristics of speech; (3) mood;
(4) affect; (5) content of thought; and (6) sensorium functions.
See Tr. 658.

Also in December 2013, Dr. Edward Martin, a state agency psychologist who did not examine Payne, reviewed her medical records and completed a Psychiatric Review Technique ("PRT") assessment on her. See 29 C.F.R. §§ 404.1520a & 416.920a (describing the psychiatric review technique). He opined that Payne had: (1) no restrictions on her activities of daily living; (2) mild difficulties in maintaining social functioning; (3) mild difficulties in maintaining concentration, persistence, or pace; and (4) had had no episodes of decompensation that had lasted for an extended duration. After determining that Payne's statements about the symptoms of her depression and anxiety were not credible, and noting that he gave weight to the opinions of Dr. Sipes, Dr. Martin continued:

> Dr. Sipes opines that Ms Payne, despite any impairments, is able to adequately and independently care for herself, to interact effectively with others, to maintain concentration/persistence/pace, and to otherwise tolerate the stresses common to work or work-like situations. While memory may at times be somewhat problematic for her, this difficulty does not rise above a level characterized as "mild." Thus, Impairment Not Severe is an appropriate conclusion.

Tr. 108. Dr. Martin conducted his PRT assessment before, among other things: (1) Dr. Ganem recommended that Payne see another prescriber, because she was not getting better under Dr. Ganem's medication regimen; (2) Dr. Ganem referred Payne to PHP; (3)

Payne received counseling from Stakun and Dumond; and (4) Dr.
Ganem, Stakun, and Dumond each completed a Mental Impairment
Questionnaire ("Questionnaire") on Payne.

Dr. Ganem completed her Questionnaire in October 2014,
around the time she referred Payne to PHP and nearly a year
after Dr. Martin performed his PRT assessment.  She noted
diagnoses of acute depression and anxiety with agoraphobia, and
reported that for seven months starting in June of 2013, she saw
Payne every two to four weeks for depression and anxiety.  Dr.
Ganem then checked boxes indicating the presence of 17 different
signs and symptoms of Payne's mental impairments.  Under the
heading "[o]ther signs or symptoms," Dr. Ganem reported:

> Feeling tired/little energy.  Tremors when very
> anxious.  At the same time, psychomotor retardation.
> Not wanting to get out of bed . . . until about 11 am.

Tr. 908.

When asked to characterize Payne's functional limitations,
Dr. Ganem opined that: (1) in two areas, her limitations were
mild at most; (2) in another area, she was limited at least a
third of the time; and (3) in 11 areas, she was "[l]imited most
of the time on a sustained basis."  Tr. 909.  One of the 11
areas in which Dr. Ganem found the highest degree of limitation

is "understanding and remembering instructions." Id.[3]  Dr. Ganem

also reported that Payne decompensated once or twice a year,[4] for

at least two weeks at a time, and then added this: "She's really

been 'decompensated' since June 2013."  Tr. 910.  When asked how

often Payne would be absent work because of her impairments or

treatment for them, Dr. Ganem responded "[c]annot work."  Id.

As noted above, Stakun and Dumond also completed

Questionnaires on Payne.  Because the analysis that follows does

not involve the opinions expressed in those Questionnaires, it

is not necessary to describe them in detail.  However, it is

fair to say that Stakun and Dumond gave opinions that are

largely consistent with, but not identical to, those that Dr.

---

[3] The other areas in which Dr. Ganem found sustained limitations
most of the time are: (1) completing activities of daily living;
(2) maintaining social functioning and communicating
appropriately with others; (3) concentration; (4) task
completion; (5) tolerating stresses common to a work setting;
(6) maintaining attendance and a schedule; (7) working in
coordination with or proximity to others without being unduly
distracted; (8) adapting or responding appropriately to changes
in a work setting; (9) completing a normal work day and workweek
without interruptions from psychologically based symptoms; and
(10) performing at a consistent pace.

[4] The form that Dr. Ganem completed explains: "Episodes of
decompensation are exacerbations or temporary increases in
symptoms or signs accompanied by a loss of adaptive
functioning."  Tr. 910; see also 29 C.F.R. Pt. 404, Subpt. P,
App. 1, 12.00 C.4. (describing decompensation in greater
detail).

Ganem gave in her Questionnaire.

After the Social Security Administration denied Payne's claims for DIB and SSI, she received a hearing before an Administrative Law Judge ("ALJ") who heard testimony from a vocational expert ("VE").  At the hearing, the ALJ asked about the work capacity of

> someone who's limited to light work, who can occasionally perform all of the postural maneuvers, who should avoid all ladders, ropes and scaffolds, who should avoid all hazards [which] includes unprotect[ed] heights, et cetera, and who can only . . . grasp with the right dominant hand . . . up to two thirds of the workday.

Tr. 98.  The VE testified that such a person could perform Payne's previous work as a customer service clerk and as a secretary.

After the VE testified that claimant could perform her previous work, the following exchange ensued:

> Q . . . [A]dd to that please, they'd be limited to simple, unskilled work and could maintain attention and concentration for two hour increments throughout an eight hour workday and 40 hour workweek.  So it looks like if they're limited to simple work they couldn't do any of [Payne's] past work, is that correct?
>
> A That is correct.
>
> Q Is there any other work that such a hypothetical would allow for?

Tr. 99.  The VE responded by testifying that a person covered by

that hypothetical would be able perform three different jobs at the light exertional level.

After the hearing, the ALJ issued a decision that includes the following relevant findings of fact and conclusions of law:

> 3.  The claimant has the following severe impairments: degenerative disc disease, left hip trochanteric bursitis and right wrist pain, status post surgery in 2009 (20 CFR 404.1520(c) and 416.920(c)).
>
> . . . .
>
> 4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
>
> . . . .
>
> 5.  After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl; should avoid all ladders, ropes, and scaffolds; should avoid all hazards (machinery, unprotected heights, etc.); and can frequently grasp with the right dominant hand (defined as up to two-thirds of an 8-hour workday).
>
> . . . .
>
> 6.  The claimant is capable of performing past relevant work as a customer service clerk and as a secretary.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

Tr. 49, 55, 63.

### III.   Discussion

#### A.   The Legal Framework

To be eligible for disability insurance benefits, a person must: (1) be insured for those benefits; (2) not have reached retirement age; (3) have filed an application; and (4) be under a disability.  42 U.S.C. §§ 423(a)(1)(A)-(D).  To be eligible for supplemental security income, a person must be aged, blind, or disabled, and must meet certain requirements pertaining to income and assets.  42 U.S.C. § 1382(a).  The question in this case is whether Payne was under a disability from June 10, 2013, through March 13, 2015.

To decide whether a claimant is disabled for the purpose of determining eligibility for either DIB or SSI benefits, an ALJ is required to employ a five-step process.  See 20 C.F.R. §§ 404.1520 (DIB) and 416.920 (SSI).

> The steps are: 1) if the [claimant] is engaged in substantial gainful work activity, the application is denied; 2) if the [claimant] does not have, or has not had within the relevant time period, a severe impairment or combination of impairments, the application is denied; 3) if the impairment meets the conditions for one of the "listed" impairments in the Social Security regulations, then the application is granted; 4) if the [claimant's] "residual functional capacity" is such that he or she can still perform

> past relevant work, then the application is denied; 5)
> if the [claimant], given his or her residual
> functional capacity, education, work experience, and
> age, is unable to do any other work, the application
> is granted.

Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001) (citing 20

C.F.R. § 416.920).

The claimant bears the burden of proving that she is

disabled.  See Bowen v. Yuckert, 482 U.S. 137, 146 (1987).  She

must do so by a preponderance of the evidence.  See Mandziej v.

Chater, 944 F. Supp. 121, 129 (D.N.H. 1996) (citing Paone v.

Schweiker, 530 F. Supp. 808, 810-11 (D. Mass. 1982)).  Finally,

> [i]n assessing a disability claim, the [Acting
> Commissioner] considers objective and subjective
> factors, including: (1) objective medical facts; (2)
> [claimant]'s subjective claims of pain and disability
> as supported by the testimony of the [claimant] or
> other witness; and (3) the [claimant]'s educational
> background, age, and work experience.

Mandziej, 944 F. Supp. at 129 (citing Avery v. Sec'y of HHS, 797

F.2d 19, 23 (1st Cir. 1986); Goodermote v. Sec'y of HHS, 690

F.2d 5, 6 (1st Cir. 1982)).

**B.   Payne's Claims**

Payne claims that the ALJ: (1) improperly analyzed her

depression and anxiety at step two of the sequential evaluation

process and thereafter; (2) improperly weighed the evidence

before him, including the opinions of Dr. Ganem, Stakun, and

Dumond, hearing testimony given by Payne's sister, and statements submitted by two other witnesses; and (3) erred by determining that she had the physical capacity to perform light work.  Embedded in Payne's second claim is the argument that entitles her to a remand: the ALJ's assessment of her residual functional Capacity ("RFC")[5] is not supported by substantial evidence.

At step two, the ALJ considered Payne's mental impairments, i.e., depression and anxiety, and found them to be non-severe because "the longitudinal record indicates no more than mild limitations" resulting from those impairments.  Tr. 50.  While the ALJ noted mild limitations at step two, he included no limitations resulting from mental impairments in Payne's RFC. The complete absence of any limitations resulting from Payne's mental impairments, however, is at odds with the evidence upon which the ALJ said he relied when he determined Payne's RFC.

According to his decision, the ALJ "considered and assigned great weight to the opinion of examining psychologist Dr. Sipes," who "opined that the claimant is able to understand and

---

[5] "Residual functional capacity" is a term of art that means "the most [a claimant] can still do despite [her] limitations." 20 C.F.R. §§ 404.1545(a)(1) & 416.945(a)(1).

remember <u>simple</u> oral and written instructions."  Tr. 61
(emphasis added).  Dr. Sipes was also asked about Payne's
ability to "understand and remember <u>detailed</u> instructions."  Tr.
660 (emphasis added).  She did not opine that Payne had that
ability.  Thus, her opinion that Payne could understand and
remember simple oral and written instructions must be viewed as
a limitation resulting from Payne's mental impairments.[6]  Despite
giving great weight to Dr. Sipes's opinion, the ALJ did not
include the limitation from that opinion in his assessment of
Payne's mental RFC.  In other words, without support from the
opinion on which he purported to rely, the ALJ determined that
Payne had the mental RFC for a full range of understanding and
remembering oral and written instructions, an RFC that exceeds
the capacity that Dr. Sipes found.

      The Acting Commissioner attempts to save the ALJ's RFC
assessment by pointing to the ALJ's assignment of great weight
to the opinion of Dr. Martin.  Like the ALJ, Dr. Martin gave
weight to Dr. Sipes's opinion, but as explained above, Dr. Sipes
did not determine that Payne had the mental RFC to perform the
full range of understanding and remembering written and oral

---

[6] Without belaboring the point, the court has considered, but is
not persuaded by, the Acting Commissioner's arguments to the
contrary.

instructions.  Moreover, Dr. Martin conducted only a PRT
assessment; he did not assess Payne's mental RFC.  See Social
Security Ruling 96-8p, 1996 WL 374184, at *4 (S.S.A. 1996)
(explaining that "[t]he mental RFC assessment used at steps 4
and 5 of the sequential evaluation process requires a more
detailed assessment by itemizing various functions contained in
the broad categories found in paragraphs B and C of the adult
mental disorders listings in 12.00 of the Listing of
Impairments, and summarized on the PRT [form]").  Therefore, Dr.
Martin offered no opinion on Payne's ability to understand and
remember either simple or detailed written and oral
instructions.  In short, like the opinion in Dr. Sipes's Mental
Health Evaluation Report, Dr. Martin's PRT assessment does not
provide substantial evidence in support of an RFC assessment
that does not include a limitation on Payne's ability to
understand and remember instructions.  And, there is nothing
else in the record that counts as substantial evidence in
support of that component of the ALJ's RFC assessment.

The Acting Commissioner also argues that even if the ALJ
erred by failing to include the limitation described above in
Payne's RFC, any such error was harmless because the VE
testified that a person with Payne's physical RFC who was

16

limited to simple unskilled work could perform a substantial number of jobs.  That argument lacks merit.  In his decision, the ALJ only went so far as to determine that Payne was capable of performing her previous work.  He did not conclude, in the alternative, that if Payne were limited to simple unskilled work, she could perform the jobs identified by the VE at the hearing.  Furthermore, "the court cannot affirm the ALJ's decision based upon rationales left unarticulated by the ALJ." Jenness v. Colvin, No. 15-cv-005-LM, 2015 WL 9688392, at *7 (D.N.H. Aug. 27, 2015) (citing High v. Astrue, No. 10-cv-69-JD, 2011 WL 941572, at *6 (D.N.H. Mar. 17, 2011)).  Thus, the Acting Commissioner's reliance upon the VE's testimony about other jobs is misplaced.

In sum, this case should be remanded because the ALJ's RFC assessment is not supported by substantial evidence.  Given that recommendation, there is no need to address claimant's remaining arguments for reversal.  That said, in the interest of encouraging a proper consideration of Payne's claim on remand, the court observes that the decision to give limited weight to Dr. Ganem's opinion may not have been well founded.

The ALJ states that Dr. Ganem's opinion "is inconsistent with her own exam notes that show largely normal mental status

exams." Tr. 61.  While the record is replete with reports on mental status exams conducted by other providers, it does not appear that Dr. Ganem's notes document any complete mental status exams of the sort documented in Dr. Sipes's Mental Health Evaluation Report, see supra note 3, or the medical records generated by providers such as Margaret Dorson and Dr. David Tung.[7]  Without any complete mental status examination by Dr. Ganem, it is difficult to evaluate the ALJ's determination that Dr. Ganem's notes show normal mental status exams.  Furthermore, Dr. Ganem's notes include a good number of findings on Payne's psychological condition that appear to fall outside the "normal" range.[8]  And, on several occasions during the time period when

---

[7] Office notes from each provider include a separate heading for a mental status exam.  Under that heading, Dorson typically recorded findings on Payne's level of consciousness, physical appearance, manner, posture, motor activity, mood, thought process, thought content, delusional thinking, affect, and speech.  See, e.g., Tr. 1095.  Dr. Tung typically recorded findings on Payne's judgment/insight, speech, mood and affect, thought contents, and attitude.  See, e.g., Tr. 410.  In contrast, Dr. Ganem's notes from the relevant time period do not include a heading for a mental status exam.  Rather, Dr. Ganem covered some but not all of the categories of a standard mental status exam under the headings "general" or "psych."  Thus, it does not appear that Dr. Ganem performed any complete mental status exams.

[8] Those findings include: (1) on June 25, 2013, "anxious . . . [t]earful at times," Tr. 828; (2) on July 10, "[d]epressed affect," Tr. 833; on August 8, "depressed affect and anxious," Tr. 839; (3) on September 16, "[d]epressed affect and

the ALJ said that Payne's mental status exams were largely normal, Dr. Ganem described Payne's depression and anxiety as chronic, see Tr. 852, and characterized Payne as "[v]ery symptomatic still," Tr. 868, and "stable but still very symptomatic," Tr. 876.

Beyond that, while recognizing that it is for the ALJ to resolve conflicts in the evidence, see Irlanda Ortiz, 955 F.2d at 769, the court is compelled to point out that the inference the ALJ draws from Dr. Ganem's "largely normal mental status exams," i.e., that Dr. Ganem overstated Payne's functional limitations, would seem to be undermined by the fact that after treating Payne's depression for approximately nine months, Dr. Ganem expressly advised Payne to seek treatment elsewhere because she was not getting better under the treatment regimen that Dr. Ganem was providing.  A string of normal findings would not usually be expected to result in the advice Dr. Ganem gave Payne (or her subsequent referral of Payne to PHP).  In addition, while the ALJ relies upon his interpretation of Dr.

---

psychomotor retardation," Tr. 857; (4) on October 3, "[d]epressed affect with some psychomotor retardation," Tr. 866; (5) on October 18, "[d]epressed affect with some psychomotor retardation," (6) on November 1, "[t]ired appearing and somewhat depressed affect," Tr. 876; and (7) on March 28, 2014, "depressed affect," Tr. 895.

Ganem's "mental status exams" to discredit her opinion on
Payne's mental RFC, he says nothing about the results of the 11
PHQ-2 depression screens that Dr. Ganem administered to Payne
between June 25, 2013, and March 28, 2014.  See Tr. 825, 895.
Those results would appear to support the functional limitations
that Dr. Ganem identified in her opinion.[9]

Finally, the court is concerned by the following passage
drawn from the ALJ's decision:

> She [Dr. Ganem] stated the claimant has been
> "decompensated" since June 2013, and that she has had
> [a] recent increase in symptoms of decompensation with
> orthopedic issues starting in June 2014 when she
> underwent microdisectomy and then fell and broke her
> pinky finger.  The record includes no emergency
> department treatment or inpatient hospitalizations
> related to a mental impairment.

Tr. 61.  The point of that passage is unclear, but it could
plausibly be read as a challenge to Dr. Ganem's determination
that Payne had suffered from decompensation.  However, if an ALJ

---

[9] Payne routinely scored five or six on the six-point scale used
to evaluate the results of PHQ-2 depression screening, which
suggests relatively strong depression.  See Rivera v. Astrue,
No. 10 CV 4324(RJD), 2012 WL 3614323, at *13 n.16 (E.D.N.Y. Aug.
21, 2012)(explaining that the PHQ-2 is scored on a six-point
scale); Petticrew v. Colvin, No. 4:13-CV-2119, 2014 WL 2880019,
at *5 (S.D. Tex. June 23, 2014) (characterizing a PHQ-2 score of
four as "a positive screen for depression"); Zorrilla v. Colvin,
No. 3:12-01188, 2014 WL 1317650, at *14 (M.D. Tenn. Mar. 27,
2014) (noting that a PHQ-2 score of two is a negative screen for
depression), R. &. R. adopted by 2015 WL 4420845 (July 17,
2015).

may not permissibly craft an RFC from raw medical data, <u>see</u>
<u>Nguyen v. Chater</u>, 172 F.3d 31, 35 (1st Cir. 1999), it would seem
even more impermissible for an ALJ to challenge a physician's
medical conclusion by interpreting medical data and drawing a
conclusion from those data that is different from the conclusion
drawn by the physician.  Moreover, notwithstanding the ALJ's
apparent suggestion to the contrary, evidence of
hospitalization, which may support an inference of
decompensation, is not necessary to demonstrate decompensation.
<u>See</u> 29 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00 C.4.

The bottom line is this.  On remand, it will be necessary
to weigh Dr. Ganem's opinion on Payne's mental RFC.  When doing
so, the ALJ should probably consider the issues discussed above.


## IV.  <u>Conclusion</u>

For the reasons given, the Acting Commissioner's motion for
an order affirming her decision, doc. no. 14, should be denied,
and Payne's motion to reverse that decision, doc. no. 10, should
be granted to the extent that this matter is remanded to the
Acting Commissioner for further proceedings, pursuant to
sentence four of 42 U.S.C. § 405(g).

Any objection to this Report and Recommendation must be

filed within 14 days of receipt of this notice.  See Fed. R. Civ. P. 72(b)(2).  Failure to file an objection within the specified time waives the right to appeal the district court's order.  See United States v. De Jesús-Viera, 655 F.3d 52, 57 (1st Cir. 2011); Sch. Union No. 37 v. United Nat'l Ins. Co., 617 F.3d 554, 564 (1st Cir. 2010) (only issues fairly raised by objections to magistrate judge's report are subject to review by district court; issues not preserved by such objection are precluded on appeal).

_Andrea K. Johnstone_
Andrea K. Johnstone
United States Magistrate Judge

May 20, 2016

cc:  Janine Gawryl, Esq.
     T. David Plourde, Esq.